FILED IN CHAMBERS
U.S.D.C. Atlanta

NOV 21 2005

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DENNIS MICHAEL SMITH,

      Plaintiff,

   v.

FEDERAL EXPRESS CORPORATION,

      Defendant.

CIVIL ACTION

NO. 1:04-CV-1955-RLV

O R D E R

This is an action pursuant to the Americans with Disabilities
Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, in which the plaintiff also
asserts that the defendant Federal Express Corporation ("FedEx")
retaliated against him for requesting a reasonable accommodation
under the ADA.   Pending before the court is FedEx's motion for
summary judgment [Doc. No. 19].

## I. Background and Procedural History

The following facts are gleaned from the court's review of the
record, the parties' submissions, and the briefs submitted by the
parties.   The plaintiff, Dennis Michael Smith began working for
FedEx in February 1999 as a part-time Courier at its Dunwoody
Station in the Atlanta, Georgia area.[1]   During his tenure of part-

---

[1] The court notes that the plaintiff has an associate degree in
criminal justice, a bachelor degree in political science, and has
attended two semesters of law school.   He also holds a real estate
certificate and a paralegal certificate, and is currently studying
aircraft maintenance with the objective of obtaining an airplane

time employment with FedEx, the plaintiff changed his position at FedEx five times[2] and had a pattern of accepting positions at FedEx and then asking his manager to modify his work schedule in order to accommodate his other part-time jobs, school, or personal interests.[3]   In June 2002, the plaintiff began working as a Material Handler at FedEx's Atlanta Ramp.  The plaintiff's work at the Atlanta Ramp consisted of unloading, loading, and sorting packages that were transported by FedEx's airplanes to and from Atlanta during the late night and early morning hours.

During the fall of 2002, the plaintiff received two written disciplinary notices for violating FedEx's Acceptable Conduct Policy.   The record indicates that the plaintiff received these disciplinary notices because he was verbally abusive to other FedEx employees.[4]   According to FedEx policy, the plaintiff received a

---

and power plant license.  The plaintiff had previously worked as a paralegal, a fleet service agent with a passenger airline, a travel agent, and a courier, and has also worked in the retail industry. The plaintiff has in the past worked multiple part-time jobs simultaneously, while attending school at least part-time.

[2] For each position that the plaintiff accepted, FedEx notified him that the schedule and hours for that position could be changed to meet FedEx's operation demands.  FedEx's policy required that the hours, shifts, and days of its employees' work week remain flexible due to the nature of its business.

[3] Starting in May 2002, the plaintiff started to advocate for a policy that would have allowed employees to trade shifts and buy vacation days.   FedEx's management considered the plaintiff's proposals but informed the plaintiff that his policies would not work for FedEx's Atlanta, Georgia operation.

[4] The two written disciplinary notices were dated October 11, 2002, and December 28, 2002.  The court notes that the plaintiff appealed both of these notices and FedEx's internal appeal process upheld both of these notices.

letter in December 2002 which stated that he was prohibited from applying for and/or making internal transfers for twelve months.[5]

In January 2003, the plaintiff was diagnosed with a cardiovascular disease and began a five-month medical leave of absence from FedEx in order to recover from cardiac bypass surgery, which took place on January 15, 2003.   On or about January 21, 2003, FedEx Human Capital Management Program ("HCMP") Manager Genevieve Rupley sent the plaintiff a letter providing him with information about FedEx's leave policy.

In a letter dated May 12, 2003, the plaintiff's treating cardiologist, Dr. Jose A. Torres, of the Cardiac Disease

---

[5] The letter to the plaintiff dated December 24, 2002 states:

On December 11, 2002 you were involved in another altercation with one of FedEx Express Agencies.  After conducting an investigation into the matter, it was determined that your conduct was in violation of the Acceptable Conduct policy (2-5), a copy of which is attached for your review.

Dennis, the investigation shows you were screaming, intimidating and displayed blatant and public disrespect toward an employee.  You have been warned previously of similar violations in a documented Warning Letter on October 11, 2002.

As a result of your behavior pattern, this warning letter is being issued.   Please be advised that recurrent patterns of behavior will not be tolerated.  A repeat of this or any other behavioral problem may result in severe action, up to and including termination.

This warning letter is active for 12 months; i.e. you will not be allowed to submit a Job Change application (JCA) during this timeframe.   In addition, 3 notifications of deficiency (any combination of warning letters and/or performance reminders) received within a 12-month period may result in your termination).

Specialists, P.C., cleared the plaintiff to return to work.[6]  Dr. Torres concluded that the plaintiff "may return in full capacity to his job, without any restrictions."

On or about May 27, 2003, the plaintiff informed Rupley that he intended to begin classes at Clayton State University in mid-August.  After the plaintiff was cleared to return to work by his cardiologist, Rupley offered the plaintiff a choice of two positions at FedEx.  One of the positions offered to the plaintiff was the same position that the plaintiff held before going out on medical leave.  The other position was a part-time Material Handler position on the early morning shift (herein referred to as the "AM shift") at the Atlanta Ramp.  In an email dated June 6, 2003, Rupley outlined the proposed schedule for the "AM shift" position and informed the plaintiff that his manager would be Paul Blalock.  The "AM shift" entailed the plaintiff's working Tuesday through Friday staring at 3:30 a.m. ending at 7:30 a.m. and Sunday starting at 11:00 p.m. and ending Monday at 5:00 a.m.  On June 6, 2003, the

---

[6] Specifically, the doctor's letter stated:

Mr. Dennis Michael Smith was seen in my office on 5/12/03. He is status post coronary artery bypass graft x 3 on 1/15/03.  He has been active in cardiac rehab for some time now, and has been doing quite well.  He is asymptomatic, and does not have chest pain or shortness of breath.  He has demonstrated in cardiac rehabilitation that he has no limits in his physical abilities and can lift 75 pounds as required by his job description.

The only follow-up medical treatment required by the cardiologist was that the plaintiff was required to see the cardiologist every six months for a check-up and to undergo a stress test every two years.

4

plaintiff responded to Rupley's two proposals:

> Thank you very much for your e-mail.  At least I know exactly what the choices are.  Before this, and after speaking with Mr. Boatwright, I wasn't sure what they were.
>
> There is one complication, however.  While this AM schedule would work better with school and my girlfriend will (of course!) like it better and it does have more hours, I was totally unaware of the Sunday night "graveyard" shift.  Beforehand, the AM's were a "straight" 0300ish to 0700ish M-F or T-S.  Wanting to know exactly what the hours are is one of the reasons I raised all of the questions I did.
>
> While I still feel this is superior to the "old" PM job for reasons already stated, since the "new" AM schedule is a little different than I'd thought (again, reason to question) I would appreciate if I could have a few days to think about the two and make a firm choice on Monday. This will be in time to start at 0330/10 June or, in the unlikely event I choose the "old" PM, 1730/13June.  Only now am I sure exactly what the choices are.  Either way, I will be firm in one by Monday afternoon.

On June 7, 2003, the plaintiff responded:

> After going over the "updated" AM schedule and the cardiac rehab gym schedule, probable school schedule, medication matter, ect., I am don't need until Monday to decide.  There are no overt conflicts and this is the best schedule for all.  I am FIRM and GO for the AM position.

The court notes that the above email reflects the plaintiff's firm acceptance of the "AM shift" with the Sunday shift.[7]

On June 7, 2003, the plaintiff returned to work at FedEx as a part-time Material Handler on the "AM shift" at the Atlanta Ramp.

---

[7] In prior offer letters sent by FedEx to the plaintiff, the plaintiff had been notified that he could not transfer for twelve months after accepting a position.

On June 10, 2003 in a letter to his "AM shift" manager, the plaintiff stated:

> The only thing I possibly see as a problem with either the "rehab" or school is the "oddball" Sunday-Monday 2300-0500 shift, which may impact rehab as well as school. I guess I'll find out the impact on rehab this upcoming Monday, as again, this work schedule's impact on it won't really be known until I've worked awhile. I am planning on taking classes from 0830-1400 M-F, provided I am approved for financial aid.

In response, the plaintiff's managers told him that the Sunday shift was a requirement of his position because FedEx had assigned the Sunday shift in order to reduce the amount of overtime incurred on that shift of FedEx's operation at the Atlanta Ramp. On June 23, 2003, the plaintiff again asked his manager to drop the Sunday shift from his schedule, claiming that he was requesting an accommodation for "medical needs" under the ADA because his doctor had recommended he "work a 'regular' schedule to allow for 'normal' sleep patterns."

On June 25, 2003, Blalock and Blalock's Senior Manager, Frank Brogan, met with the plaintiff. A factual dispute exists as to what was said during this meeting. FedEx alleges that Blalock and Brogan attempted to explain the importance of the plaintiff's Sunday shift to FedEx's operation, the bidding procedures at the Atlanta Ramp, and the purpose of the plaintiff's position which included the Sunday shift in reducing overtime costs incurred

during the "AM shift" at the Atlanta Ramp.[8]  Furthermore, FedEx
alleges that at this meeting with Blalock and Brogan, the plaintiff
admitted that he is physically able to work the Material Handler
"AM shift" and wanted the different schedule only because his
doctor recommended that he have a "normal sleep pattern."[9]  The
plaintiff alleges that during the meeting with Blalock and Brogan,
Brogan did not respond to him "in a very friendly way" and implied
that the plaintiff's heart condition was his own fault.[10]

Regardless of what was allegedly said or not said during the
above meeting, the plaintiff again agreed to work the "AM shift"
with the Sunday shift.  In an email dated June 25, 2003, the
plaintiff stated, "I feel my proposal was reasonable, I understand
your point of view and while I don't like your position, I can live
with it and will work the current schedule for now."  The email

---

[8] On July 10, 2003, Blalock wrote the plaintiff a letter
stating that the "Sunday at 2300-0500 (Sunday) shift is not going
away for you.  It is a requirement of a job that you accepted.  You
were placed on that shift in an effort to reduce overtime and save
company dollars.  By implementing your so called solution, nothing
is accomplished."

[9] At his deposition, the plaintiff stated that other than the
difficulties he had getting sleep and taking his medication during
the summer of 2003, his activities were not limited.  The plaintiff
testified that he was just required to watch his diet, get a
"healthy amount" of sleep, and take medication to control his blood
pressure and heart rhythm.  The plaintiff admitted that he was not
limited from doing anything that was physically demanding.

[10] The plaintiff admits that he did not recall Brogan's exact
words, but the plaintiff alleges that Brogan made "derogatory
statements" to him, like "I'll take your resignation if you can't
work these hours."

7

continued:

> The general practitioner's (Dr. Rosenberger) note, combined with the his endorsement of my comments (my 17 June memo, paragraph four, section 2) makes it pretty clear that "consistent" means hours approximately the same every day and something closer to "normal" hours. This is not an absolute bar to my present hours, but a professional opinion that the above is healthier.

A few days later on July 1, 2003, the plaintiff filed an Charge of Discrimination with the EEOC. In his EEOC charge, the plaintiff stated, "I believe that I have discriminated against because of my disability and retaliated against for making numerous requests for an accommodation, in violation of the Americans with Disabilities Act of 1990."[11] Also in early July 2003, the plaintiff followed company procedure and submitted a formal accommodation request to FedEx's corporate headquarters, along with Dr. Rosenberger's note dated June 17, 2003.[12] While FedEx examined his request, the plaintiff was placed on a two-week leave of absence on July 10. 2003.

On July 11, 2003, Rupley and Human Representative Wanda English received an email from the plaintiff concerning his

---

[11] On July 1 and 2, 2003, the plaintiff was "written up" twice for being late. In the plaintiff's affidavit, he admits that he was late but argues that the issue had "never arisen before–even though I often came in after the start of my shifts due to working multiple jobs."

[12] Dr. Rosenberger's note dated June 17, 2003, which stated that "It is recommended that Dennis work on a regular schedule, to allow for normal sleep patterns."

interest in two Handler positions that had been recently posted on FedEx's internal posting system. English informed the plaintiff that he was not able to apply for these positions because he had two active written disciplinary notices. Additionally, English stated that once he had accepted the "AM shift" position at the Atlanta Ramp upon his return from the leave of absence, he could not apply for another FedEx position for at least twelve months. The plaintiff testified at his deposition that when he was placed on leave for two weeks in July 2003, he did not expect FedEx to give him another job or ask him to return to work. As a result, the plaintiff obtained another part-time job as a paralegal for a law firm and decided to add more classes to his school schedule.

FedEx alleges that on July 24, 2003, it declined the plaintiff's request for an accommodation because it determined that there was insufficient documentation to substantiate his request. Consequently, FedEx directed the plaintiff to return to his "AM shift" on July 31, 2003. The plaintiff failed to appear for work on that date and told FedEx that he would not work for two more weeks because he had planned a week of vacation and he would not abandon the part-time paralegal job he had started while on his two-week leave. In reaction, FedEx directed the plaintiff to appear for work on August 3, 2003, or FedEx would consider him to have resigned. The plaintiff stated that he would work his "AM shift" for a limited time but demanded a job with hours consistent

9

with his doctor's recommendation and school hours.

On August 3, 2003, the plaintiff went to work.  The plaintiff alleges that three days later, on August 6, 2003, he suffered a severe medical reaction to his work schedule.  On August 6, 2003, the plaintiff presented a second note from Dr. Rosenberger.  In the note dated August 6, 2003, Dr. Rosenberger wrote, "I do not believe that working 'graveyard shift' is good for Dennis' health due to heart, hypertension, sleep problems, anxiety, depression."

After taking a week of scheduled vacation during the week of August 10, 2003, the plaintiff notified Blalock that he would not report to work during the week of August 18, 2003, because he was starting school at Clayton State.   On August 18, 2003, the plaintiff wrote in an email that he would continue to call in sick for every shift until FedEx placed him on a leave of absence or terminated his employment.

In order to investigate the credibility of the plaintiff's medical condition and his request for an accommodation, FedEx contacted Dr. Rosenberger directly to request a clarification of his August 6, 2003, note.  Dr. Rosenberger informed FedEx that plaintiff's cardiologist had cleared him to return to work. Furthermore, Dr. Rosenberger stated that it was his opinion that there were no medical restrictions which would prevent the

plaintiff from returning to the "AM shift" work.[13]

On August 26, 2003, FedEx notified the plaintiff of Dr. Rosenberger's clarification and instructed him to report to work. The plaintiff reported to work on August 28, 2003, and he told his manager that he would be seeking additional medical opinions and that he expected FedEx to accommodate his school schedule. After August 28, 2003, the plaintiff never returned to work again. For every shift for which he was scheduled to work, the plaintiff either called in sick or stated that he would not work for a number of reasons, some of which were medical and others related to his school schedule. In an email dated September 1, 2003, the plaintiff demanded that FedEx either reduce his work schedule to three days per week or give him three months of "educational" leave. On September 3, 2003, English responded to the plaintiff's requests, stating that FedEx did not grant educational leaves. Furthermore, English stated that it was the opinion of the plaintiff's doctor that the plaintiff could work the "AM shift," warned the plaintiff that his continued absences could result in his termination, and informed him that he must report to work on September 4, 2003. In an email dated September 3, 2003, the plaintiff voiced his disagreement. However, the plaintiff failed

---

[13] The court notes that Dr. Rosenberger wrote a note dated August 25, 2003, stating that there "are no medical work restrictions preventing Dennis Michael Smith from working the morning shifts he agreed to work. His cardiologist has cleared him."

11

to submit any additional medical evidence to contradict Dr. Rosenberger's August 25, 2003, opinion.

On both September 4 and 5, 2003, the plaintiff failed to report to work. Blalock informed the plaintiff on September 10, 2003, that FedEx considered him to have voluntarily resigned his employment because he had failed to provide acceptable reasons for two consecutive absences in violation of FedEx's Attendance Policy.[14]

On June 28, 2004, the plaintiff filed this action against FedEx, alleging that FedEx had refused to provide him with a reasonable accommodation and ultimately terminated him because of his disability. Additionally, the plaintiff alleged that FedEx had retaliated against him for requesting an accommodation by telling him he could not apply for other jobs because he had been disciplined, making threatening or derogatory statements to him,[15] forcing him to go on a two-week leave of absence in July 2003 and

---

[14] FedEx's Employee Handbook states, "If you fail to report to work for two consecutive days without notifying management, you will be considered as having voluntarily resigned your employment. You are responsible for having your manager's name, home, work, and pager numbers at all times."

[15] The plaintiff had alleged that during his June 25, 2003, meeting with Blalock and Brogan, certain statements were made that the plaintiff considered threatening and/or implied that the plaintiff's heart condition was his fault. The plaintiff previously alleged that these statements were made in retaliation for his request for an accommodation. Since the plaintiff did not raise this issue in his response brief, the court concludes the plaintiff has abandoned this allegation for purposes of his retaliation claim.

by terminating his employment.

## II. Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his or her on which he or she bears the ultimate burden of proof. Id. at 322-23. Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324. Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322.

### III. Legal Analysis
### A. ADA Claim

Under the ADA, 42 U.S.C. § 12112(a), an employer

> may not discriminate against a qualified individual with
> a disability because of the disability of such individual
> in regard to job application procedures, the hiring,
> advancement, or discharge of employees, employee
> compensation, job training, and other terms, conditions,
> and privileges of employment.

A plaintiff alleging discrimination in violation of the ADA bears

the burden of establishing a *prima facie* case, including that he is

disabled. Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189,

1193 (11th Cir. 2004). To make out a *prima facie* case of

discrimination under the ADA, an ADA claimant must prove that: (1)

he has a disability; (2) he is a qualified individual; and (3) he

was discriminated against because of his disability.[16] Id. citing

---

[16] The Eleventh Circuit, starting with Morisky v. Broward
County, 80 F.3d 445 (11th Cir. 1996), has consistently formulated
the third prong in this matter. See, e.g., Maynard v. Pneumatic
Products Corp., 233 F.3d 1344 (11th Cir. 2000), Hillburn v. Murata
Electronics North America, Inc., 181 F.3d 1220 (11th Cir. 1999).
This, of course, is incorrect because if a plaintiff has proved
that he was discriminated against because of his disability, he has
actually proved his entire case (and he is entitled to have
judgment entered in his favor), not simply made a *prima facie*
showing. The third prong should be a showing of adverse employment
action--the same as in other discrimination suits. This error
began when Morisky formulated the three-prong test and then cited
Tyndall v. National Educational Centers, 31 F.3d 209, 211 (4th Cir.
1994) in support. However, Tyndall formulated this three-prong
test as a method by which a plaintiff could establish that 42
U.S.C. § 12112(a) had been violated (and, thereby, win his case),
not as a way of presenting a *prima facie* case. Because of
Morisky's improper citation to Tyndall and because the Eleventh
Circuit has failed to correct this error, a plaintiff, seemingly,
has the burden of proving his entire case as part of his *prima*

Williams v. Motorola, Inc., 303 F.3d 1284, 1290 (11th Cir. 2002).

See also Pritchard v. Southern Company Services, 92 F.3d 1130 (11th

Cir. 1996).  Unlawful discrimination may also consist of a failure

to provide a reasonable accommodation for a disability if that

accommodation would enable the employee to perform an essential

function of the job. See Lucas v. W.W. Grainger, Inc., 257 F.3d

1249, 1255-1256 (11th Cir. 2001).

Once a plaintiff establishes a *prima facie* case of

discrimination, the defendant must articulate a legitimate,

nondiscriminatory reason for the challenged action and/or actions.

See Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000).

However, the employer's burden is merely one of production. Id.  If

the defendant articulates one or more such reasons, the presumption

of discrimination is eliminated, and the plaintiff has the burden

to come forward with evidence, including the previously produced

evidence establishing the *prima facie* case, sufficient to permit a

reasonable fact-finder to conclude that the reasons given by the

employer were not the real reasons for the adverse employment

decision.'" Id. If the plaintiff fails to proffer sufficient

evidence to create a genuine issue of material fact as to whether

_____

*facie* case.  Despite the way that the Eleventh Circuit has
articulated this prong of the test, this court will not require the
plaintiff to prove discrimination as part of his *prima facie* case;
instead, the court will require only that he show that adverse
employment action was taken.  Because the third prong of the ADA
*prima facie* case is not in dispute in this case, the court will
address only the first two prongs of the above test.

each of the defendant's proffered reasons is pre-textual, the defendant is entitled to summary judgment. Id. at 1024-25.

In this case, FedEx argues that the plaintiff has failed to make out a *prima facie* case of discrimination based on the plaintiff's alleged disability. Specifically, FedEx denies that the plaintiff is "disabled" as defined by the ADA and/or that he is a "qualified individual with a disability."[17]  In his response to FedEx's motion for summary judgment, the plaintiff argues that he meets the "actual" and "perceived" definitions of a disability and that he is a "qualified individual with a disability."

Under the ADA, the term "disability" is defined as follows: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(2).  To qualify as "disabled" under the "actual" disability definition of 42 U.S.C. 12102(A), a plaintiff must show (1) he suffers from a physical or mental impairment, (2) which affects a major life activity, (3) to a substantial degree. See Bragdon v. Abbott, 524 U.S. 624, 631 (1998).  In analyzing a disability claim, the Supreme Court has instructed that the statutory phrase "substantial limitation"

_____

[17] The statute defines a "qualified individual with a disability" as an individual with a disability who, with or without reasonable accommodation can perform the essential functions of the employment position that such individual holds or desires. 42 U.S.C. § 12111(8).

16

requires, at a minimum, that a plaintiff must show that he is unable to work in a broad class of jobs. Sutton v. United Air Lines, 527 U.S. 471, 491 (1999). Therefore to be "substantially limited" in the major life activity of working, a plaintiff must be precluded from more than one type of job, a specialized job, or a particular job of choice. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of work. Id.

In this case, the plaintiff claims that he was limited in the major life activity of working in that he was unable to work late-night shifts or shifts with varying start times during the summer of 2003.[18]  The plaintiff attempts to distinguish between working the "AM shift," which he categorizes as being from 3:30 a.m. to 7:30 a.m., and what he refers to as the "graveyard" shift on Sunday, which consisted of working 11:00 p.m. to 5:00 a.m. However, this distinction is of no consequence in the law. The court concludes that the plaintiff's alleged inability to work a certain shift, i.e., the Sunday shift, without more, is insufficient to constitute a disability under the ADA. See Sutton,

---

[18]  In response to FedEx's motion for summary judgment, the plaintiff asserts in an affidavit that he has the following permanent restrictions : (1) he cannot engage in heavy lifting, (2) he must maintain a consistent sleep pattern of eight to nine hours per night, (3) he must take certain prescribed medications at exact times each day, and (4) he must refrain from activities which raise his anxiety and stress levels. However in his deposition, the plaintiff contradicted this and admitted that he was not limited from doing anything physically active.

17

527 U.S. at 491-492. See also Mont-Ros v. City of West Miami, 111 F.Supp.2d 1338, 1353-54 (S.D. Fla. 2000)(finding that the plaintiff's inability to work midnight shifts did not significantly restrict his ability to perform either a class of jobs or a broad range of jobs in various classes and, therefore, he was not disabled). In fact, the opinion of the plaintiff's own treating physician in a letter dated August 25, 2003, states that there "are no medical work restrictions preventing Dennis Michael Smith from working the morning shifts he agreed to work. His cardiologist has cleared him." Furthermore despite having the opportunity to do so, the plaintiff has not submitted any additional medical evidence to contradict the medical opinion of his own treating physician. Lastly, the plaintiff in his affidavit in response to FedEx's motion for summary judgment inadvertently admitted that he is not disabled. The plaintiff states:

> Dr. Rosenberger's second note changed nothing because I have never had a problem with working the "A.M./morning" portion of my schedule (from 3:30 a.m. to 7"00 a.m.). In fact, if my schedule were this way consistently, I would have no problems whatsoever.

Thus, the plaintiff's alleged inability to work a late-night shift on Sunday or rotating shifts, by itself, does not satisfy the definition of an "actual" disability under the ADA.

Alternatively, the plaintiff asserts that he is "disabled" within the meaning of the ADA because FedEx regarded him as having an impairment that substantially limited one or more major life

18

activities.   To prove that FedEx regarded him as having a "disability" or that he was "perceived" to have a "disability" by FedEx, the plaintiff must prove that he is an individual who (1) has a physical or mental impairment that does not substantially limit major life activities but was treated by his employer as constituting such limitation, or (2) has a physical or mental limitation that substantially limits major life activities only as a result of the attitudes of others toward such an impairment. Gordon v. E.L. Hamm & Associates, Inc., 100 F.3d 907, 912-13 (11th Cir. 1996).   As with an "actual disability" discussed above, the "perceived disability" must be substantially limiting and significant. Id.   In this context, the significant impairment is one that is viewed by the employer as generally foreclosing the type of employment involved, not just a narrow range of job tasks. Id. See also Hilburn v. Murata Electronics North America, Inc., 17 F.Supp.2d 1377, 1382 (N.D. Ga. 1998).

To support the proposition that FedEx perceived him to be "disabled", the plaintiff cites to the fact that he was placed on a two-week leave of absence after he filed an accommodation form in July 2003.   In response, FedEx argues, "All this really shows is that, while FedEx considered his request for an accommodation, it acknowledged [the plaintiff's] own allegation that he was unable to perform his Sunday shift requirement."   Additionally, FedEx argues citing to Murphy v. United Parcel Service Inc., 527 U.S. 516, 525

19

(1999),[19] that even if the court assumes that the plaintiff was regarded by FedEx as being unable to perform a particular shift of a particular job, i.e., the Sunday shift of the "AM shift" Material Handler position, such assumption would be insufficient in itself as a matter of law to prove that the plaintiff was regarded by FedEx as substantially limited in the major life activity of working in general.  The court agrees.

The court concludes that even if the court assumes that FedEx considered the plaintiff unable to work the particular Sunday shift, there is nothing in the record to suggest that FedEx regarded the plaintiff as substantially limited from any other job or from work in general.  The evidence in the record indicates that FedEx knew that plaintiff had a full schedule, which included working part-time as a paralegal at a law firm and attending school at least part-time.  Additionally, the plaintiff expressed his willingness and admitted to being physically able to work other shifts at FedEx via his numerous emails to FedEx.  Because the plaintiff has not shown that he is "disabled" under either the "actual" or "perceived" definitions of the ADA, he cannot demonstrate a *prima facie* case.  Having not satisfied the first prong of a *prima facie* cause of ADA, the court concludes that  it

---

[19] In <u>Murphy</u>, the United States Supreme Court held that a mechanic who was only unable to perform a particular job was not to be regarded as substantially limited in the major life activity of work. <u>Murphy</u>, 527 U.S. at 525-526.

is therefore unnecessary to consider the other prong of the plaintiff's *prima facie* case, i.e. whether he is a "qualified individual with a disability."

Alternatively, even if the court were to assume that the plaintiff had presented a *prima facie* case, his disability discrimination claim would still fail. FedEx has proffered a legitimate, nondiscriminatory reason for terminating the plaintiff, i.e., his failure to report to work for two consecutive days without providing an approved excuse. The plaintiff has not sufficiently demonstrated that FedEx's reason for his termination was a pre-textual one. Therefore, FedEx is entitled to summary judgment on the plaintiff's claim of discrimination under the ADA.

### B. Retaliation

The same analytical framework applies to retaliation claims as applies to other employment discrimination claims. Wright v. Southland Corp., 187 F.3d 1287, 1305 (11th Cir. 1999). To establish a *prima facie* case of retaliation, the plaintiff must show: (1) that he engaged in a statutorily protected expression; (2) he suffered an adverse employment action; and (3) there was a casual link between the adverse action and his protected expression. Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1260 (11th Cir. 2001). The causal link element is construed broadly so that "'a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" Olmsted v. Taco Bell Corp.,

141 F.3d 1457, 1460 (11th Cir. 1998) quoting <u>EEOC v. Reichhold</u> <u>Chems., Inc.</u>, 988 F.2d 1564, 1571-72 (11th Cir. 1993). Once a plaintiff has established a *prima facie* case, the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action. <u>Id.</u> The ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct remains on the plaintiff. <u>Olmsted</u>, 141 F.3d at 1460.

In his complaint, the plaintiff alleges that FedEx discharged him in retaliation for filing an ADA charge and for his requests for a reasonable accommodation, i.e., not having to work the Sunday shift in question. In his complaint, the plaintiff alleged:

> Defendant's action of forcibly placing Mr. Smith on unpaid medical leave when two (2) open positions existed which would have reasonably accommodated Mr. Smith's needs constitutes an adverse employment action.
>
> Defendant's termination of Dennis Michael Smith constitutes an adverse employment action.
>
> The myriad of other systematic actions taken by Defendant to deny Dennis Michael Smith accommodation and, thereby, deny him the opportunity to work and earn money collectively constitutes an adverse employment action.

In its brief and reply brief in support of its motion for summary judgment, FedEx argues that the plaintiff has failed to make out a *prima facie* cause of retaliation, arguing that the plaintiff failed to prove that any of the above actions, with the exclusion of his termination, were adverse job actions. Additionally, FedEx argues that the plaintiff failed to prove the

22

causation prong of the test. Alternatively, FedEx argues that even if this court were to assume that the plaintiff established a *prima facie* case of retaliation, the plaintiff has failed to rebut each of FedEx's legitimate, nondiscriminatory reasons for its actions.

For the sake of judicial economy, the court assumes, without deciding, that the plaintiff made out a *prima facie* case of retaliation. However even with that assumption, the court concludes that the plaintiff's retaliation claim still fails because he has failed to rebut the legitimate, nondiscriminatory reasons proffered by FedEx for its actions.

First, with regard to FedEx's termination of the plaintiff's employment, the evidence in the record indicates that the plaintiff failed to appear for work for two consecutive days in September 2003. The evidence in the record also indicates that on September 3, 2003, English warned the plaintiff that his continued absence without medical documentation to support his continued requests for an accommodation, i.e., not having to work the Sunday shift, would result in his termination. It is further undisputed that the plaintiff failed to submit any additional medical documentation to support his need for accommodation in September 2003 or thereafter. Moreover, the undisputed evidence indicates that FedEx had a policy in its Employee Handbook which stated that individuals who were absent for two consecutive days were considered to have voluntarily resigned. Given these facts, the court concludes that no question

23

of pretext arises. See Combs, 106 F.3d at 1534-35.

Second, with regard to FedEx's action of placing the plaintiff on unpaid medical leave when two open positions in FedEx's Atlanta area operation existed, the evidence in the record indicates that the plaintiff was placed on leave in July 2003 so that FedEx could investigate what accommodations, if any, the plaintiff needed after he filed an accommodation form.  The facts in the record indicate that FedEx's investigation revealed that the plaintiff's accommodation form relied exclusively on one doctor's recommendation which stated that the plaintiff should work a regular schedule to allow for "normal sleep patterns", not that he was disabled.  FedEx had two policies that prohibited the plaintiff from transferring.  First, a policy existed that prohibited an individual with disciplinary notices from transferring for at least twelve months.  Second, FedEx had a policy that those individuals who accepted a job were prohibited from transferring for at least twelve months.  FedEx's compliance with these two policies thereby prohibited it from transferring the plaintiff to any position that was open at the time.  Therefore after its investigation, FedEx promptly requested that the plaintiff return to work to his "AM shift" because it had not received evidence that indicated that he was medically unable to do so.  The court finds that FedEx has proffered a legitimate, nondiscriminatory reason for its decision to put the plaintiff on leave during its investigation into the

plaintiff's disability status, i.e., its need to investigate the plaintiff's accommodation form. Moreover, legitimate, nondiscriminatory reasons exist for FedEx's refusal to transfer the plaintiff and these legitimate reasons were not rebutted by the plaintiff.

Third, in his affidavit in response to FedEx's motion for summary judgment, the plaintiff alleges that he was written up for being late in retaliation for filing an ADA charge and/or for making requests for accommodation. However, the plaintiff in the same line of the affidavit admits that he was actually late for work each of the days in question but should have been excused because he had previously been late for work numerous times in the past and he was not written up. The court finds this argument to be unpersuasive.

Finally, the plaintiff argues that FedEx enforced its policy of not allowing individuals with written disciplinary notices to transfer and/or apply for other jobs within FedEx against him in retaliation for his filing of an ADA charge and/or for his requests for an accommodation. However, the evidence in the record demonstrates that FedEx sent the plaintiff a letter dated December 24, 2002, which predated both his request for an accommodation and his filing of an EEOC charge; that letter informed the plaintiff that he would not be allowed to transfer for twelve months due to the written disciplinary notice in his employment file. Moreover,

the evidence in the record indicates that it was FedEx's policy that employees could not request a transfer for at least twelve months after accepting a position as discussed above. Because, the plaintiff has failed to rebut FedEx's legitimate, nondiscriminatory reasons for its actions, FedEx's motion for summary judgment is granted with regard to the plaintiff's retaliation claim.

### IV. Conclusion

For the foregoing reasons, the court GRANTS FedEx's motion for summary judgment [Doc. No. 19].


SO ORDERED, this 21ˢᵗ day of November, 2005.


_____
ROBERT L. VINING, JR.
Senior United States District Judge